This case on our calendar is Izoukwu v. The City of New York. Good morning, counsel. You may proceed. Thank you, Your Honors, and may it please the Court. I'm Greg Antolino, and I'm here with my co-counsel, Danielle Inouye, and we both conducted the second trial in this case, although we did not — we were not involved in either the first trial or the first appeal. In that appeal, this Court held it that it was compelled — you, Judge Pooler, held the Court was compelled to reverse because a single harmful instruction allowed the jury to infer that a failure to speak to the police could be a factor in determining probable cause. Correct. But in the second trial, the City had a different theory, and I'd like you to respond to that, that there was a violation of the Park Rules. They never brought that up in the first case. That's true. Now, if that's not a violation of the mandate rule, I'm not sure if it is. We pointed out that this rule, and we're assuming their interpretation of the rule. We gave two interpretations. First, this is nonsense, that you can't have a kid — you can't come into the park without a kid when there are adult elements of the park. But we're dropping down to their level. You didn't challenge the complaint, did you? No, we're — well, at that point, we were into the case for so many years, we weren't going to be able to amend the complaint. I think it should have been initially. But here we are at the second appeal, and their argument is that no adult can enter a multi-use park without having someone who is 12 years or under. That's the rule that's posted. That is the rule that's posted, although it's confusing because the jury did say that the sign says both area and areas. You don't argue that. No, we're not arguing that. What we're arguing is this. What we're arguing is this, that this is simply an unenforceable rule based on their interpretation. A 2.4 — and it is 2.4, not 2.6 — a 2.4-acre park is too large of a space in which a police officer can determine, just by looking at someone, whether they have a 12-year-old in the park. And as both — Counsel, you're changing your theory, too. Below, you argue that he had children there. Well, we did argue he had children there, but we're assuming — we are assuming their facts of the case for the purpose of Rule 50. And what the police officer knew at the time that she made the decision to arrest him, and she said simply that he was looking down, he didn't have diapers, he didn't have a stroller, and — You know, not every parent travels with all this. I know that. And we pointed that out to the jury and to the judge. And in order to enforce this law, as they accept its interpretation that you can have a kid on this corner and an adult on the other kiddie corner, the only way to enforce it is to get the defendant to admit that he has no children, or to bring the plaintiff to the children. But that didn't happen in this case. What happened was, instead of moving on, as Yuzoko pointed out, allows a suspect to do, moving on and accepting the plaintiff's right not to speak to the police, they took his Jell-O and smashed it into the garbage. And that's going to rile up any reasonable circumstance. And anyone under any reasonable circumstance with a police officer does something like that. So are you asking us to make a pronouncement as a matter of law? No. But that was — I'm not understanding your argument. The argument is that — What went wrong with the trial on the facts? We're not arguing facts. We're arguing law. Although, well, we do argue that the immigration evidence was — You had a trial, right? Yes, we had a trial. Before a jury? Before a jury. All right. So we're here reviewing a jury's determination based on the charge to the jury that the defendants are not liable. And the — I'm sorry. You're with me so far? Yes, yes, yes, yes. All right. And what else? And the fact that there was no evidence of probable cause of disenforcement of the parks rule. Did you argue that in the jury? Absolutely, we argued that to the jury. We argued — So the jury had no basis for finding that there was evidence? That's correct. And what's the — And what was missing? Sinaquanon of — What was missing? What was missing was any evidence whatsoever that there were children in the park. And they used the police officer's knowledge at the time — Well, if there's no evidence of children in the park, that seems the officer might be reasonable in concluding that there — that he didn't have children in the park. There were children in — The officer doesn't have to testify. What did the officer say was the reasons that she arrested him? That he was looking down, he was eating Jell-O, he had no kitty stuff — There's no indication of having a child there. Well — Right? Yes? It's not what you think should or should not make probable cause. The question is whether the officer had arguable probable cause. And so the question is, would reasonable officers disagree that the facts that the officer offered, not what you think is important to decide probable cause, but the facts that the officer offered constitute a reasonable understanding of probable cause? And it — Justice Sotomayor — What were the facts that the officer relied on? The facts that the officer relied on were sheer surmise and conjecture. Don't characterize. Facts. Tell me the facts. There were simply that he was looking down and eating Jell-O. And then finally what they repeatedly asserted was that he didn't answer their question. She said other things, didn't she, that there was no stroller, there was no indications of anything that the children — the children — that some people would have in the park? And none of that — Yes? Yes? Yes. She did. We accept — What other facts did she say? Nothing. We just added a few before. Nothing. They threw in a book bag — On those facts — Yes. Could reasonable officers disagree as to whether he did or did not have children in the park? No. Not in a 2.4-acre park. And if you're wrong, you lose. No, because there's also the disorderly conduct and the failure to find — One of the three is enough. No, but in this case — in this case, that's true. You are right. You are correct. You are correct. You can't talk to me about obstructing justice or disorderly conduct. I'm not interested. I understand, Judge. But as this — Go ahead and talk about it. But as this Court held in Izuku 1, which is the law of the case, it was not inevitable that the jury would find on any of these things, given the disputed evidence, that the trial judge, for example, bifurcated and simultaneously instructed the jury on probable — on proximate cause. There's no way you can reconcile — Liability depends on proximate cause? What? Liability depends on proximate cause. Proximate cause is certainly an appropriate charge on the liability sentence. Otherwise — excuse me. Otherwise, you've separated the acts which deviate from the norm that defines the tort from the injury. But we had no evidence of the injury. So you can't — It's not that the injury comes in on damages. But the causal relationship between the arrest and the lack of probable cause has to be established. The arrest was not the injury. We asked the judge to instruct on that. You sued for false arrest, didn't you? What? You sued for false arrest? We sued for false arrest, but proximate cause — False arrest had something to do with the injury. The arrest had something to do with it, but the injury was — it could have been a dollar. It could have been $200,000. But proximate cause applies to whether the person who is found at fault at the first stage of the trial caused the harm. So proximate cause in a strict liability case, in a strict liability proceeding, has no function. And the only case that they point out was a case that you decided, Justice Wesley, involving multiple tort feasors, where in — where it was a new question of law, and the court held you had to decide that question on liability, but not the other side, because you don't — you have to decide who is at fault and at what percentage. Am I running out of time? Have I exceeded my time? You've reserved two minutes. I've reserved two minutes. Thank you. Thank you, counsel. We'll hear from the city of New York. May it please the court. I'm Daniel Matza-Brown, assistant court branching counsel on behalf of the appellees. You agree, as counsel did, that in the first trial, you didn't talk about the fact that there were no children, that Mr. Izuku had no children there, correct? Your Honor, in the first trial, Mr. Izuku testified at length that he had children that were coming to visit him. And his allegation was that the children were playing while he was beaten badly by police officers and then hauled off to jail while his children were stranded in the playground. That was his testimony in both trials. What the city did not argue to the jury there was that that was — that to be in the park without children was an arrestable offense. The city — This is in the first trial. In the first trial, it became more to the court, I believe, at the end of that trial, I believe maybe right before summations, and counsel can correct me if I'm wrong, that in fact it can be a Class B misdemeanor and therefore is an arrestable defense. So with that case law from the New York Court of Appeals, on the second trial, the city did argue three bases for the arrest. The first, which we've been discussing, is being in the park without children. I think — I just want to emphasize one point there. The officers saw Mr. Izuku without what we're calling kiddie-stuff strollers. They saw him not — you know, right by the swing set. So this question of whether he's in an area where you need children is really kind of a red herring. He was not on the bocce courts. He was not in the basketball courts. He was right by the swing set. And he was no business eating Jell-O. Staring down eating Jell-O, that's right, Your Honor. And not attending to any children. And the first thing that the officers asked him was, Sir, do you have children with you? And they asked that a couple times, and he did not look up at all. And I think that that's really important because — Although we found that it was improper to accuse him of violating any offense by not answering the police. That's right, Your Honor. And what I think is really important — But he didn't answer. Someone grabbed the Jell-O and threw it away. What I think is really important, Your Honor — And you're right on those points. What's really important about — And I agree. What's really important about the interaction here is if I'm in a park with kids under 12, and I'm their caretaker or their parent, and I'm not actively attending to them, and I'm looking down at a book or Jell-O or whatever, but I'm not actively attending to my young children, and a police officer or anybody says, Excuse me, sir, do you have children with you? And I'm in a park that has eight open gates. My kids are off playing, and it's crowded. I'm going to look up and make sure my kids are okay. I'm not going to just ignore someone saying, Do you have kids with you? My kids could have run off. My kids could have fallen. There might be a fight. There's something — The fact that someone's there without any indication of children and shows no concern, does not even look up to see if his children are there when he's asked about children, I think any reasonable officer in those situations is going to believe — Grab his Jell-O, throw it away, and start harassing him? Your Honor, Your Honor, I think that we are all in some ways upset by what happened with the Jell-O. And I think that we need to understand that that's not what this — that's not the lawsuit here, right? That's not a Section 1983 claim. That's exactly right. And I think, you know, under decisions like Towns from this Court that says the fruit of the poisonous tree, you know, does not apply in false arrest actions, I think even if the Jell-O is what provoked Mr. Izuku to act in a disorderly way, that does not bar an arrest for disorderly conduct, right? The question is whether the — Even if it was provoked? I believe — I believe that that is the law, Your Honor. That's not — I believe that's correct. His main argument is that he was minding his own business, and whatever he did was provoked by this aggressive behavior on the part of the police. Your Honor — He literally was minding his own business. Your Honor, I think that what's important — there are two important points to recognize there. First is that the officers had probable cause regarding the park rule and his refusal to obey their order to leave before anything happened with the Jell-O. That's not the park rule. You've got a tough problem. Excuse me, Your Honor? As to the park rule, you have a tough case. Your Honor, I think that — Arresting someone under the park rule of probable cause, they can interpret his — the way he looks. And he can't be charged with obstructing justice by refusing to answer an officer's question. That's clear under New York law. And Judge Pooler was very careful to point that out in her prior opinion, rightfully so. But as to the park rule, his silence and their inability to confirm whether he does or doesn't have children in the park is something that might be relevant to them with regard to their conclusion as to whether he's in violation of the rule or that it's reasonable belief that he might be. Your Honor, I think what's important with respect to those points is, as you pointed out, they need probable cause to ask for one and only one offense. Under these circumstances, there's probable cause to arrest him for being there without children and also to arrest him not for not responding, but for not obeying their direct order that he leave once they had reason to believe he was there without children. With respect to disorderly conduct, I think that if you look at the town's decision, which is 176 F. 3rd. 138, and also this Court's holding in Pinter, which — entrapment is not a defense in the false arrest case. I think that what those cases stand for is a proposition that even if somebody is upset by what a police officer has done, if what they're doing is yelling obscenities in a crowded playground and those meet — that conduct causes small children to gather and it meets the elements of the statute under New York law, these questions of First Amendment defenses are relevant in a criminal proceeding. If he were convicted of disorderly conduct, those would be viable arguments, these First Amendment arguments, but they don't come into play here, Your Honor. What's always troubled me about this case is that Mr. Izuku's response was to a provocation by the police who saw him sitting there, a black man, eating Jell-O, literally minding his own business. And they start asking him questions and eventually provoke him to the point where he is arrested for disorderly conduct. It could happen to any of us, although it doesn't usually happen to white women over a certain age. But I understand that — how he feels. Your Honor, I believe that this case is very different if he's not minding his own business in a playground right by the swing set. And I think that the city does have an interest in making sure that there are not people from any background in what's really an area for children to be playing. Is that generally enforced? Your Honor, the record here doesn't have a ton of information, but the record is totally clear that the officers approached somebody else for exactly the same reason, right before they approached Mr. Izuku. It seemed to me they'd be interested if someone was emotionally disturbed or perhaps a sexual predator or a pedophile registered sex offender was sitting in the park waiting to see a child that looks unattended. Your Honor, yes, there are very compelling reasons that this rule is in place and that this rule is enforced. In the presence of someone like that. That's right, Your Honor. I think turning to just quickly the question of proximate cause, which my colleague addressed, I think it's clear here that the question is on proximate cause, can we tie each defendant's conduct to the allegedly false arrest? There were two defendant police officers. There was a sergeant who was not named as a party who actually ordered the arrest. And the evidence shows that one of the officers, for instance, took the jello, the other did not. One of the officers led the questioning, the other did not. With respect to each defendant, did that defendant's conduct cause the allegedly false arrest? And because that's a question that is relevant to liability, that was a proper charge for the jury. I just want to speak briefly to what my colleague has deemed the immigration evidence, which really was simply evidence from a custodian of records as to whether Mr. Izuku's children were in New York City or not on the day of the incident. Mr. Izuku testified at length, as I noted, that his kids were in the playground at the time, that he was beaten while they were there, and he was then hauled off to jail while his kids were stranded in the playground. These are very, very concerning allegations. And the police officers did not believe them to be true. They did not believe that he had children there. They firmly believed that. And they were entitled, as defendants in this matter, to present evidence showing Mr. Izuku's testimony to be false. I think it probably would have been a reversible error for the court not to allow the custodian of records to present that evidence. As the district court properly explained, it had nothing to do with immigration status. And it's plaintiff who's saying that this somehow suggests an illegal entry. The city's theory is and always has been that the children did not enter the country at all. And that's why this evidence is relevant and should have come in. And therefore, they could not have been there. That's right, Your Honor. And for the reasons stated in our briefs, we urge this court to affirm. Thank you, counsel. Thank you. Mr. Antolino, you have two minutes. A crime is a crime, and there's no exception if the crime involves children, adults, or both. They bolstered their argument to provoke Mr. Izuku into speaking by this picture, which is at 1267 of the record, which shows that the bench that he sat at was in the bench area, not at the playground. Wait a second. You didn't raise that argument. Yes, we did. Yes, we did. But do you raise that argument in your brief here? Yes. A quote. That he wasn't in the area, and therefore, that park rule didn't apply to him? Well, no, we didn't. So tell me where the location of the bench is. Excuse me. When you have not argued that as a matter of law, that rule did not apply? The point I am making is that now that we have conceded that it applies to the entire park, they're trying to say that it applies to specific parts of the park. All right? And our point is, okay, we'll agree with you that you can't have a kid, you can't come in without a kid somewhere in the park. But if that's true, you've got to have a reasonable suspicion unbolstered by immigration records, which were inherently prejudicial and that the judge performed no balancing test, that he had no children in the park. And what they did was they used his failure to answer their questions to him. Any normal person would answer our questions. Mr. Uzuku, as it happened, had just finished surgery and we presented a stipulation as to that effect. He was very tired and on painkillers. That's probably why he didn't speak. But the bottom line is he doesn't have a right to speak. He has a right not to speak. But he won the first trial. That's right. He has a right not to speak. He did not have to look up to the police officers. And having provoked him into the rage that they claim, he said, he did on the park, is, number one, identical to people against Baker in the Court of Appeals of New York, which describes probable cause. The circumstances in that case involved police officers with people all around. And this is the same thing. The Court of Appeals held it was no probable cause. The order to leave the park was a conditional order based on a hunch, a word we asked. Please, let's use a non-legalism. It was not a direct order. It was a conditional order. Mr. Antolino, let me ask you one question, and then we'll let you sit down, because you're well over your time, of course. But do you have any argument with your opposing counsel's representations that your client had laid out the facts before the jury about having children in the park? No, we didn't testify until the very end. In fact, we offered, we'll just take that out and we won't have to get into this immigration nonsense. But it did go in. It went in after they brought in the department, because we reversed the order of witnesses. So we didn't have to bring in the issue of the children as an affirmative. The issue of the children was before the jury. It was, of course, in a sense, since that's what they argued throughout the entire trial, but we didn't affirmatively have to bring it forward. Thank you very much.